WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Airbus DS Optronics GmbH, a foreign company,<br><br>                    Plaintiff,<br><br>v.<br><br>Nivisys LLC, WWWT Enterprises LLC, Nivisys Industries LLC, and First Texas Holdings Corporation,<br><br>                    Defendants. | No. CV-14-02399-PHX-JAT<br><br>**ORDER** |
| AND RELATED COUNTERCLAIM | |

Pending before the Court are several motions from each party, including: WWWT's motion for summary judgment (Doc. 221); First Texas Holding's motion for summary judgment (Doc. 228); Nivisys, LLC's motion for summary judgment (Doc. 230); Airbus DS's motion for summary judgment as to alter ego (Doc. 232); Airbus DS's motion for summary judgment as to defendants Nivisys, LLC and WWWT Enterprises (Doc. 233); Defendants' motion to exclude Airbus DS's expert (Doc. 268); and Airbus DS's motion to strike Defendants' objections to evidence (Doc. 272). The Court now rules on each motion in turn.

**I.    Background**

**A.    The Credit Agreement and Subsequent Transfers**

Nivisys Industries, LLC ("Industries") was an Arizona limited liability company

that manufactured and sold defense and surveillance technology products. (Doc. 231 ¶ 1). In March 2008, Industries' members sold the entirety of their interest in the company to private equity firm Relativity Holding, LLC and its subsidiary, Nivisys Holdings, LLC (collectively "Holdings"). (Doc. 222 at ¶ 9).  The purchase was financed by a loan ("the Credit Agreement") from CapitalSource Finance, LLC ("CapSource"). (Doc. 222 at ¶ 10, Doc. 231 at ¶ 5). The Credit Agreement included a $13 million term loan and a $10 million revolving line of credit, and granted CapSource a security interest in all of Industries' and Holdings' assets. (Doc. 222 at ¶ 15; Doc. 229 at ¶ 4).

Between 2008 and 2011, CapSource advanced funds to Industries and Holdings in accordance with the Credit Agreement. But Industries and Holdings were unable to meet their payment obligations, which prompted a total of nine amendments to the Credit Agreement. (Doc. 222 at 27; Doc. 229 at ¶ 5). Despite the amendments, Industries and Holdings were still unable to cure the defaults. As a result, CapSource and First Texas Holdings Corporation ("First Texas") began communicating about the possibility of First Texas purchasing an interest in Industries' debt under the Credit Agreement. (Doc. 222 at ¶ 36; Doc. 229 at ¶ 9).[1]

On November 16, 2011, First Texas signed a Loan Purchase and Sale Agreement under which it acquired the option to purchase the Credit Agreement from CapSource. (Doc. 222 at ¶ 44; Doc. 231 at ¶ 20). In February 2012, First Texas exercised its purchase option and acquired Industries' and Holdings' debt under the Credit Agreement. First Texas immediately assigned its interest in the Credit Agreement to Nivisys, LLC ("Nivisys"), a wholly-owned subsidiary of First Texas.  (Doc. 222 at ¶ 68; Doc. 231 at ¶ 28; Doc. 250 at 68). Nivisys then sent a default letter to Industries and Holdings, demanding that they pay the full amount owed under the Credit Agreement. (Doc. 222 at ¶ 73, Doc. 250 at ¶ 73). Industries and Holdings were unable to cure the defaults, and on February 29, 2012, Nivisys filed a receivership suit to enforce its rights under the Credit

---

[1] There is, however, a dispute regarding whether CapSource first approached First Texas, or whether First Texas first approached CapSource. (*See* Doc. 250 at ¶ 36).

Agreement. (Doc. 222 at ¶ 76; Doc. 250 at ¶ 76). On March 29, 2012, Nivisys assigned its interest in the Credit Agreement to WWWT Enterprises, LLC ("WWWT"), a wholly-owned subsidiary of First Texas. (Doc. 222 at ¶ 80; Doc. 250 at ¶ 80; *see also* Doc. 234 at ¶ 6).

The parties agreed to settle the receivership suit in an agreement dated March 14, 2012 (the "Settlement Agreement"). In that agreement, Holdings agreed to surrender the entirety of its membership interest in Industries to WWWT. (Doc. 222-4 at p. 134). Later, on August 1, 2012, WWWT foreclosed on the Credit Agreement. It then entered into an agreement with Industries in which Industries surrendered the collateral secured by the Credit Agreement to WWWT in exchange for partial satisfaction of Industries' debt (the "Surrender Agreement"). (Doc. 233 at 3; Doc. 234 at Exhibit T; Doc. 234 at Exhibit A, Deposition at 46:14–48:12; 50:15–17; 51:16–62:5). That same day, Industries and Nivisys entered into a contract in which Nivisys agreed to perform certain of Industries' outstanding manufacturing obligations, in light of the fact that Industries no longer had control of the assets it needed to fulfill them (the "Subcontract Agreement"). (Doc. 234, Exhibit U). After its sales contract obligations had been met, Industries was liquidated and ceased operations. (Doc. 222 at ¶ 120; Doc. 250 at ¶ 120).

**B.    The Co-Operation Agreement Between Airbus and Industries**

Against the backdrop of the facts described above, Industries entered into a contract with Plaintiff, Airbus DS Optronics GmbH, a German corporation ("Airbus"). Under that contract ("the Co-Operation Agreement"), Industries agreed to purchase, and Airbus agreed to supply, certain components of an Industries product. (Doc. 234, Exhibit WW). The Co-Operation agreement was initially effective for a two-year period beginning in September 2008, and thereafter automatically renewed each year for four additional years. (Doc. 234, Exhibit WW at 7).

Industries breached the Co-Operation agreement in October 2011. (Doc. 234, Exhibit O). Pursuant to the breach, a German court entered judgment against Industries and awarded it attorneys' fees and costs for a total amount of $1,269,290.05, plus interest

at a rate of 10 percent per annum until paid. (*Id.*). That judgment was domesticated and entered against Industries in Maricopa County Superior Court on April 16, 2014. (*Id.*).

Airbus now claims that First Texas, WWWT, and Nivisys are liable for the judgment entered against Industries, arguing, *inter alia*, that the transfers of debt and assets through the Credit Agreement, Settlement Agreement, and Surrender Agreement were fraudulent. Plaintiff Airbus and defendants First Texas, WWWT, and Nivisys (collectively "Defendants") have each filed separate motions for summary judgment, in addition to several non-dispositive motions.

## II.     Non-Dispositive Motions

### A.     Motion to Exclude Expert Witness

The Court first addresses Defendants' joint motion seeking to exclude the testimony of Airbus's expert witness, Timothy Gay. (Doc. 268). In that motion, Defendants argue Gay's testimony is not admissible under any of the requirements for expert testimony, including qualifications of the witness, knowledge, helpfulness of the testimony, and the reliability of the foundational data.

Federal Rule of Evidence ("Rule") 702 governs the admissibility of expert opinion testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)–(d). In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court explained that Rule 702 imposes a gatekeeping obligation upon the trial court, requiring it to make a preliminary assessment of the admissibility of

expert testimony. To fulfill that obligation, "the trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (applying *Daubert* gatekeeping obligation to all expert testimony, not just scientific). Under Rule 702, the Court must make separate determinations as to whether the expert is appropriately qualified, whether his testimony is relevant, and whether his testimony is reliable. *See Daubert*, 509 U.S. at 591; *see also Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 (9th Cir. 2002) (indicating that reliability of an expert's testimony is a distinct inquiry from whether an expert is qualified).

### 1. Qualifications of Mr. Gay

Timothy Gay is a licensed Certified Public Accountant with a Bachelor's degree in accounting. (Doc. 282-2 at 33:24–334:3). He has had 45 years of accounting experience, with emphases on business valuation and mergers and acquisitions. (Doc. 282-1 at Exhibit D). Although the Court agrees with Defendants' statement that Gay is not qualified to testify as a legal expert (Doc. 268 at 3), it is satisfied that Gay has sufficient "knowledge, skill, experience, training, [and] education" to serve as a financial expert in this case.

### 2. Relevance of Mr. Gay's Opinion

As to whether his testimony is relevant, Defendants argue that Gay's expert report veers away from the facts and improperly opines as to the proper application of the law governing successor liability and alter ego. (Doc. 268). Upon review of the report, this Court agrees. Mr. Gay's expert report contains numerous examples of legal conclusions, couched as Mr. Gay's "opinions" as to ultimate issues of law. (*See, e.g.*, Doc. 268-19 at 1–8; Doc. 268-20 at 1–20). Such expert testimony is inappropriate; an expert may not undertake to "tell the jury what result to reach." *United States v. Duncan*, 42 F.3d 97, 101 (2d. Cir. 1994). To the extent that Gay's report seeks to offer legal opinions or conclusions, those opinions are not admissible at trial.

Portions, however, of Gay's expert report, in addition to his deposition testimony

and rebuttal report, contain relevant and helpful opinions regarding the valuation of assets. (*See, e.g.*, Doc. 268–19 at 8–9). Contrary to Defendants' argument, these opinions are capable of offering "appreciable help" to the jury. *See United States v.Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986). As a result, the Court declines to exclude Gay as a witness entirely. At trial, the parties may assert which portions of his opinion testimony they seek to admit. Based on the purpose for which the opinions will be offered, the Court will determine at that time whether the opinion is relevant.

### 3.    Reliability of Mr. Gay's Opinion

As to Defendants' argument that Gay's opinion is so unreliable as to be inadmissible at trial, the Court declines to make such a ruling at the summary judgment stage. Gay's opinions are not entirely without foundation. His report cites to a lengthy list of sources upon which he relied, including disclosure statements, tax returns, deposition transcripts, third-party appraisals, and codified accounting standards. (Doc. 268-21 at 1–11). These sources are sufficiently reliable to allow Gay to form a valid opinion. To the extent that Defendants argue otherwise, they are free to cross-examine Gay as to his sources and the basis for his opinions at trial. Similarly, Defendants also argue at great length that Gay's opinions are based on improper methodology. At trial, Defendants may cross-examine Gay in an attempt to discredit his opinions and prove to the jury that his methods were lacking, but the Court will not make such a determination at this stage.

### B.    Defendants' Objections and Airbus's Motion to Strike

Defendants also filed objections to several of Airbus' exhibits (Doc. 270), which Airbus included in its controverting statement of facts to WWWT's motion for summary judgment (Doc. 250). The Court overrules Defendants' relevance objections, and notes that to the extent the documents may be irrelevant, the Court will not rely on them in making its decision on summary judgment. *See Quanta Indem. Co. v. Amberwood Dev. Inc.*, No. CV-11-01807-PHX-JAT, 2014 WL 1246144, at *3 (D. Ariz. Mar. 26, 2014) (discussing relevance objections at the summary judgment stage).  For purposes of this Order only, the Court also overrules Defendants' objections as to improperly

authenticated documents.  *See id.* at *2-*3 (discussing admissibility objections at the summary judgment stage).  Finally, to the extent that Defendants object to Timothy Gay's rebuttal expert report (Doc. 250-26, Exhibit Z), the objection is overruled for the reasons stated in section A above. All objections are overruled without prejudice to a party reasserting the objection, as appropriate, at trial. Because the Court overrules Defendants' objections, Plaintiff's motion (Doc. 272) is denied as moot.

## III.   Summary Judgment Motions

The Court now addresses Airbus's substantive arguments against Defendants. Airbus asserts that summary judgment should be granted against defendants WWWT and Nivisys under the theories of successor liability and fraudulent transfer of assets. (Doc. 233). WWWT and Nivisys have filed motions for summary judgment arguing that no fraud exists and that successor liability does not apply. (Doc. 221, 230). Airbus also argues that First Texas should be liable for Industries' debt under the alter ego theory of liability. (Doc. 232). First Texas has also filed a motion for summary judgment, arguing alter ego liability is inapplicable as a matter of law. (Doc. 228).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557 (9th Cir. 2004) (citation omitted); *see also* Fed. R. Civ. P. 56(a). Initially, the party moving for summary judgment has the burden of demonstrating to the Court the basis for and the elements of the causes of action upon which summary judgment should be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to establish that a material dispute in fact exists. *Id.* The non-movant must show more than "some metaphysical doubt as to the material facts;" instead, the non-movant must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A "genuine" factual

dispute exists if the evidence, and not only a party's bare assertions, would allow a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

## A.    Successor Liability

Generally, when a company sells or transfers its assets to another, the successor company is not responsible for the debts and liabilities of the former company. *Warne Invs., Ltd. v. Higgins*, 195 P.3d 645, 651 (Ariz. App. 2008) (citing *A.R. Teeters & Assocs., Inc. v. Eastman Kodak Co.*, 836 P.2d 1034, 1039 (Ariz. App. 1992)). There is an exception, however, when the successor: (1) expressly or impliedly agreed to assume the liabilities of the former company, (2) is merely a merger or consolidated version of the former company, (3) is a continuation or reincarnation of the former company, or (4) transferred the assets for the fraudulent purpose of escaping liability for the former company's debts. *A.R. Teeters*, 836 P.2d at 1039; *see also Winsor v. Glasswerks PHX, LLC.*, 63 P.3d 1040, 1044 (Ariz. App. 2003).  Airbus argues that all four of the successor liability exceptions apply in this case; WWWT and Nivisys argue none of the exceptions apply, and neither company is obligated to pay the judgment owed Airbus. The Court must therefore address each exception in turn.

## 1.    Express or Implied Agreement to Assume Liability

To determine whether an express assumption of liability occurred, this Court interprets and construes the written agreements between the parties. *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 845–46 (9th Cir. 1992) (explaining that "the analysis of whether a contracting party has expressly assumed the liabilities of a seller begins by construing the parties' written agreements"). Airbus points to the Settlement Agreement between Industries, Holdings, and Nivisys (Doc. 222-4 at 134), the Surrender Agreement between Industries and WWWT (Doc. 234, Exhibit T), the Subcontract Agreement between Industries and Nivisys (Doc. 234, Exhibit U), and the Co-Operation Agreement itself

(Doc. 276-1, Exhibit WW), to argue that Defendants expressly assumed liability for the debt to Airbus.

In the Settlement Agreement, Nivisys agreed to release Holdings from its obligation under the Credit Agreement in exchange for 100 percent of its interest in the membership units of Industries. (Doc. 222-4 at p. 135). Although Industries' liability to Airbus was disclosed to Defendants in the Settlement Agreement, the agreement contains no language suggesting Defendants were agreeing to assume responsibility for that liability. (Doc. 222-4 at p. 151, Exhibit C).

The Surrender Agreement between Industries and WWWT is the mechanism through which WWWT foreclosed on the Credit Agreement. (Doc. 234, Exhibit T, p. 1). The Surrender Agreement purported to transfer only the "secured collateral" in exchange for partial satisfaction of Industries' debt. (*Id.* at 1, § B). It makes no mention of the Airbus Co-Operation Agreement, and therefore could not have included express assumption of liability thereon.

The Subcontract Agreement between Industries and Nivisys sets forth an arrangement whereby Nivisys would fulfill certain manufacturing obligations on Industries' behalf. The Subcontract Agreement did not bind Nivisys to fulfill Industries' purchasing obligations. Instead, it was an agreement by which Nivisys promised to supply the products necessary to fulfill specific contracts and purchase orders under which Industries was already bound. The Co-Operation Agreement is not listed within those manufacturing obligations. (Doc. 234, Exhibit U, pp. 1, 12).

Finally, the language of the Co-Operation Agreement itself prohibits assigning claims or rights under the agreement without prior written consent of the parties; Airbus does not allege, nor does the evidence show, that it consented to any such assignment. (*See* Doc. 276-1, Exhibit WW at 9.1). Therefore, the Court disagrees with Airbus's argument that the language of the Co-Operation Agreement made it binding on any future owner of Industries without an express agreement between the parties. In short, there is no evidence in the record to support a finding that any defendant expressly accepted

responsibility for Industries' debt.[2]

Airbus also argues that Nivisys impliedly agreed to assume Industries' obligations under the Co-Operation Agreement. Neither party has cited, nor has the Court located, an Arizona case setting forth a precise rule that governs a finding of implied liability, but other states with similar fraud statutes have found relevant facts include whether the successor's conduct shows intent to assume the debt. *See United States v. Sterling Centrecorp, Inc.*, 960 F. Supp. 2d 1025, 1038 (E.D. Cal. 2013) (explaining that implied assumption is a question of fact to be "inferred from the conduct" of the parties outside of any official agreement); *Bird Hill Farms, Inc. v. U.S. Cargo & Courier Serv., Inc.*, 845 A.2d 900, 905 (Pa. 2004).

Airbus claims Nivisys accepted benefits under the Co-Operation Agreement after it acquired the assets of Industries. (Doc. 233 at 6; *see* Doc. 266 at 7). Specifically, Airbus argues that Nivisys continued to "utilize the 'Carl Zeiss' brand name on its website and marketing materials," a benefit Airbus asserts was only bestowed upon Nivisys under the terms of the Co-Operation Agreement. (Doc. 233 at 7 n.2; Doc. 266 at 7). Defendants argue the use of the Carl Zeiss name was not the kind of beneficial use contemplated by the Co-Operation Agreement, but rather a "permissible fair use" that did not require permission. The Court agrees with Defendants. The evidence provided by Airbus shows Nivisys using the phrase "Developed by Carl Zeiss Optronics" to describe a feature of its products. (Doc. 234, Ex. CC). This constitutes the "classic fair use case," because Nivisys was using the Carl Zeiss name to describe a component of the product produced by Carl Zeiss. *See New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

Airbus also contends that Nivisys impliedly assumed the Co-Operation Agreement by taking on, among other things, the obligation to pay outstanding employee benefits

---

[2] Airbus also seems to argue that the Court should find Defendants expressly assumed Industries' liability to Airbus because there was no express disclaimer thereof. (Doc. 322 at 4). The Court finds this argument unavailing; the lack of a refusal to assume debts does not prove an express agreement to assume debts.

and honor product warranties issued by Industries. (Doc. 233 at 7). But employee benefits and product warranties are not included under or relevant to the Co-Operation Agreement between Airbus and Industries. That Nivisys may have voluntarily assumed *some* of Industries' obligations does not show, as a matter of law, that it impliedly agreed to take on *all* of its obligations. *See Sonoran Res., LLC v. Oroco Res. Corp.*, 2015 WL 11089497 at *4 (D. Ariz. Apr. 17, 2015) (citing *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1230 (C.D. Cal. 2012)) ("A corporation does not assume all of its subsidiary's debts when it chooses to voluntarily pay for a portion of those debts."). Airbus has not presented evidence to show that Nivisys impliedly assumed Industries' contractual obligations under the Co-Operation Agreement itself. Accordingly, the Court finds no genuine issue of fact, and holds that no reasonable jury could find there was an express or implied assumption of Industries' debt.

## 2.    Mere Continuation[3]

When a successor company is "substantially the same as the predecessor," successor liability may be imposed to prevent companies from avoiding debts through mere changes in form. *Warne Invest.*, 195 P.3d at 651–52 (quoting *Gladstone v. Stuart Cinemas, Inc.*, 878 A.2d 214, 222 (Vt. 2005)). Airbus argues that Nivisys is substantially the same, or a "mere continuation," of Industries. (Doc. 322 at 4.) To determine whether a successor company is a mere continuation of the original, the Court asks: (1) whether there was "insufficient consideration" to support the transfer of assets from one company to the next, and (2) whether there is a "substantial similarity in the ownership or control" of the two companies. *Teeters*, 836 P.2d at 1040.

### a.    Insufficient Consideration

Airbus's argument that Defendants paid inadequate consideration for the assets of Industries has two parts. First, Airbus contends the Settlement Agreement amounted to a

---

[3] Relying on the same rules for determining mere succession, Airbus also argues that a *de facto* merger occurred between Nivisys and Industries. Because Airbus asserts that the same rules govern a finding of *de facto* merger and a finding of mere continuation, the Court will analyze only whether Defendants were mere continuations of Industries.

"full discharge" of Industries' debt to WWWT. As a result, Airbus argues the debt purportedly extinguished by the Surrender Agreement did not actually exist at the time that agreement was executed, meaning the Surrender Agreement had no consideration. (Doc. 233 at 14).

Citing A.R.S. § 47-9620, Airbus asserts that because Industries did not expressly consent to a *partial* discharge of the Credit Agreement, the debt thereunder must have been *fully* discharged such that it no longer existed after the execution of the Settlement Agreement. (Doc. 233 at 13; Doc. 249 at 6). This Court disagrees and finds the Settlement Agreement sufficient to show express consent to a partial discharge. The Settlement Agreement provided that Holdings would be released from further obligation under the Credit Agreement in exchange for 100 percent of its membership interest in Industries, in addition to $200,000 in consideration. The Settlement Agreement went on to clarify that "WWWT is not releasing Nivisys Industries or Nivisys IC-DISC from any claims that WWWT may have against either party that arise from the Credit Agreement." (Doc. 222-4 at ¶ 6; ¶ 11(a)). The portion of the Settlement Agreement on which Airbus's argument relies deals only with how certain parties to the agreement (who are not a part of the current suit) would treat the result of the settlement for tax purposes, not whether any party's obligation to WWWT was extinguished. (*Id.* at ¶ 13(b)–(c); *see also* Doc. 258 at 12; Doc. 260 at 14). Industries, as a business entity separate and distinct from Holdings, was still obligated to WWWT under the Credit Agreement at the time the Surrender Agreement was executed.[4]

Nevertheless, the Court must also determine whether the debt discharged in consideration for the Surrender Agreement was insufficient. *Teeters*, 836 P.d2d at 1040. The debt discharged by the Surrender Agreement amounted to over $4.8 million, in exchange for "most of [Industries'] assets" (defined in the agreement as "personal

---

[4] Airbus asserts that the fact WWWT was both an owner and a creditor of Industries necessitates a conclusion that WWWT was attempting to escape Industries' debt. Although this argument is relevant to Airbus's fraud claims, the Court does not find that it is relevant to determine whether sufficient consideration was paid for the assets of Industries.

property"). (Doc. 222-4 p. 11 (Walsh Declaration); Doc. 234. Exhibit T at ¶ 2). Airbus argues WWWT paid nothing for the intangible asset of Industries' goodwill, therefore rendering the consideration paid inadequate as a matter of law. Airbus bases its argument on the deposition testimony of Defendants' valuation expert, in which he stated that goodwill was not a part of the assets transferred by the agreement: "[t]here's no value on goodwill. You don't sell goodwill." (Doc. 234, Exhibit MM, at 68:3–4).

In support of its argument, Airbus cites *Idearc Media, LLC v. Palmisano & Associates, P.C.*, 929 F. Supp. 2d 939 (D. Ariz. 2013), for the contention that if any intangible property is transferred with the business assets, the consideration paid for the transfer must reflect the value thereof. (Doc. 233 at 15). *Idearc* involved the sale and purchase of a law firm for which the successor firm paid only $2,500. 929 F. Supp. 2d at 949. That amount was purportedly in consideration for the firm's tangible assets, including a computer, office equipment, and a telephone line. *Id.* The Court found that $2,500 was insufficient because it discounted the value of the intangible assets: namely, the "knowledge and skill" of the key employee. *Id.* The Court also explained that because the vast majority of the firm's value was represented by that intangible property, allowing the successor to escape liability by reorganizing and "simply [ ] arguing that the tangible assets of the business were de minimis" ran contrary to the very purpose of the successor liability exceptions. *Id.* at 950; *see also Warne Invest.* 195 P.3d at 651 ¶ 20 (finding the mere continuation exception applied to an asset transfer because no consideration was paid for intangible assets when "both companies were service businesses that did not generate revenue from the use of tangible assets[.]")

The facts here are significantly different. Airbus has neither shown nor argued that Industries was a company whose value was based exclusively or primarily on intangible assets. Therefore, in order to show that the consideration paid was inadequate as a matter of law, Airbus must prove beyond genuine dispute the value of Industries' goodwill at the time of the transfer. It has not done so. In his report, Defendant's expert valued the assets surrendered at $4.4 million, and concluded that the $4.8 million consideration given by

WWWT and Nivisys was "reasonable and commensurate" with the value received. (Doc. 262-2 at Exhibit 2a, p. 38). In light of this testimony, the Court declines to find that the consideration paid for the Surrender Agreement was insufficient as a matter of law.

Neither, however, can the Court grant summary judgment in favor of Defendants on the issue of sufficient consideration. Despite the conclusion of Defendants' valuation expert, Plaintiff's expert concluded in his rebuttal report that the assets surrendered were worth more than $13 million at the time of the transfer. (Doc. 250-26 at 7). If the jury accepts Plaintiff's expert's testimony, it may reasonably determine that the consideration paid for the asset transfers was insufficient. The Court therefore finds that a genuine dispute of material fact exists as to this issue, and it denies all motions for summary judgment in relevant part.

### b.      Substantial Similarity in Ownership and Control

Because the Court finds there is a question of fact as to whether the consideration was sufficient to support the asset transfers, the Court cannot grant judgment in favor of either party on the issue of mere continuation; therefore, it need not address whether there was substantial similarity in ownership and control. *See A.R. Teeters & Assocs.*, 836 P.2d at 1040 (quoting *Malone v. American Pharm. Co.*, 207 Cal. App. 282, 287 (1989)) (explaining that "before one corporation can be said to be a mere continuation or reincarnation of another it is required that there be insufficient consideration running from the new company to the old"). At trial, the jury must determine whether there was a substantial similarity between the ownership and control of the companies.

### 3.      Fraudulent Purpose

Finally, Airbus argues successor liability should apply because the asset transfers were fraudulent under Arizona's Uniform Fraudulent Transfer Act (UFTA). *See A.R.S. §* 44-1001 *et seq*; *see also A.R. Teeters*, 836 P.2d at 1039 (imposing successor liability if the asset transfers were fraudulent under state law). Under UFTA, fraudulent transfers are divided into two subcategories: constructive and actual. *Hullett v. Cousin*, 63 P.3d 1029, 1031 (Ariz. 2003).

### a.    Constructive Fraud

A transfer is constructively fraudulent if the debtor made it "without receiving a reasonably equivalent value in exchange" and "the debtor was insolvent at that time or became insolvent as a result of the transfer." A.R.S. § 44-1005. The parties do not dispute that Industries was either insolvent at the time of the transfer (Defendant's position) or that the transfer rendered Industries insolvent (Airbus's position). Therefore, the Court must determine whether reasonably equivalent value was paid to support the asset transfers.

As explained in § III(A)(2)(a) above, this Court finds that a genuine issue of fact exists regarding whether the asset transfers were supported by adequate consideration. Similarly, the Court finds a question of fact exists as to whether reasonably equivalent value was exchanged. For the purposes of UFTA, "inadequacy of price does not mean a difference of opinion as to price, but a consideration so far short of the real value of the property as to startle a correct mind or shock the moral sense." *Zellerbach Paper Co. v. Valley Nat'l Bank*, 477 P.2d 550, 555 (Ariz. App. 1970). Because neither party has shown, as a matter of law, the value of the assets transferred, this Court cannot determine whether the price exchanged for the assets was so disparate as to shock or startle. *Id.* The Court therefore denies, in relevant part, each party's motion for summary judgment on the constructive fraud claims.

### b.    Actual Fraud

Next, the Court addresses Airbus's argument that the transfers were actual fraud under A.R.S. § 44-1004. As a preliminary matter, the Court reject's Defendants' argument that Airbus did not adequately allege actual fraud under A.R.S. § 44-1004(A)(1). (Doc. 258 at 10; Doc. 260 at 2–4). The significant difference between a claim for constructive fraud under A.R.S. § 1005 and actual fraud under A.R.S. § 1004 is the mindset required: the defendant must have acted with "actual intent." *See* A.R.S. § 44-1004(A)(1). And under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also Premier*

*Financial Servs. v. Citibank*, 912 P.2d 1309, 1315 (Ariz. App. 1995) ("Direct proof of fraud, however, is not required."). The allegations contained in the second amended complaint outline generally several of the indicators of fraudulent intent enumerated by § 44-1004(B). Therefore, the complaint's allegations are sufficiently particular to support an allegation of actual fraud.[5]

UFTA requires that Defendants acted with "actual intent to hinder, delay, or defraud any creditor of the debtor." A.R.S. § 44-1004(A).[6] Airbus, therefore, must present "clear and satisfactory evidence" of Defendants' fraudulent intent. *Gerow v. Covill*, 960 P.2d 55, 63 (App. 1998). UFTA outlines 11 non-exclusive factors to consider in determining whether there was fraudulent intent, including:

> 1. The transfer or obligation was to an insider.
>
> 2. The debtor retained possession or control of the property transferred after the transfer.
>
> 3. The transfer or obligation was disclosed or concealed.
>
> 4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> 5. The transfer was of substantially all of the debtor's assets.
>
> 6. The debtor absconded.
>
> 7. The debtor removed or concealed assets.
>
> 8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

_____

[5] Defendants also argue that UFTA does not apply because the only assets transferred under any of the transactions at issue were transferred pursuant to the enforcement of a valid security interest. *See* A.R.S. § 44-1001(1)(a) (defining an asset as property except "to the extent that it is encumbered by a valid lien."). But Airbus' position is that fraud tainted the entirety of the transactions involved here, not just the transfer of physical assets. Moreover, the statutory reach of UFTA is broad, and "clearly includes any transaction in which a property interest was relinquished." *Kaufmann v. M & S Unlimited, LLC*, 121 P.3d 181, 184 (Ariz. App. 2005). Accordingly, the Court finds that UTFA applies.

[6] Actual fraud may also be present if the transfer was made without the receipt of "reasonably equivalent value" in return. A.R.S. § 44-1004(A). The Court has already determined that a question of fact exists as to whether the consideration for the asset transfers was reasonable. *See also* A.R.S. § 44-1008(E)(2).

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

A.R.S. § 44-1004(B).

Even when the factors above weigh in favor of finding fraud, they are nonetheless not conclusive. *Premier Financial*, 912 P.2d at 1313 n.2. They are merely indicia from which fraud may be inferred. *Id.*

Airbus has presented evidence of the factors indicating fraud in this case. For example, the transactions in question were all made among wholly-owned insiders (Doc. 234, ¶ 5, 16), the asset transfers were not disclosed to Airbus after they were made (Doc. 234, ¶ 56), the Surrender Agreement transferred substantially all of Industries' assets (Doc. 222, ¶ 119; Doc. 231, ¶ 43; Doc. 234, ¶ 38), and the parties agree that Industries was insolvent or became insolvent shortly after the transfer was made (Doc. 222, ¶¶ 10–40). Accordingly, Airbus has established a prima facie case for fraud. But Defendants have also offered evidence to refute a finding of fraud: for example, they have presented evidence that the transfers were made for adequate consideration. *See supra* § III(A)(2)(a).

A finding of "actual intent" as a matter of law is appropriate only if the evidence presents *no* genuine issue of fact. *See In Re Beverly*, 374 B.R. 221, 235 (9th Cir. BAP 2007) (noting "actual intent" under the UFTA is a typically a question of fact). Viewing the evidence in the light most favorable to the non-moving party, the Court finds a genuine issue of material fact exists as to actual intent. Thus, the Court declines to enter summary judgment in either party's favor.[7]

---

[7] Similarly, because questions of fact exist as to whether the asset transfers were made for a fraudulent purpose, questions of fact also exist as to whether the security interests purportedly transferred thereby were valid. Accordingly, the Court cannot enter summary judgment on WWWT's counterclaims.

**B.      Fraudulent Transfer Claims**

Airbus's fraudulent transfer claims are governed by the same rules for a finding of fraud to impose successor liability. *See* A.R.S. § 44-1001, *et. seq.* The Court therefore adopts its reasoning from above and declines to enter summary judgment in favor of any party on the issue of fraudulent transfer.

**C.      Alter Ego Liability**

Next, the Court addresses the parties' motions for summary judgment regarding whether First Texas may be held liable for the allegedly fraudulent transfers as the alter ego of WWWT and Nivisys. The parties argue, at some length, about the effect this Court's ruling on the Motion to Dismiss (Doc. 195) had on Airbus's alter ego claim. In that Order, the Court agreed with Defendants that alter ego is not a standalone cause of action in Arizona, but must be tied to a substantive claim as a "basis for relief." (Doc. 195 at 5). But the Court also found that Airbus had sufficiently pleaded alter ego as it related to the claims of fraudulent transfer. The Court's Order stated, in relevant part:

> The Court must first determine which of Defendants' "corporate forms" the SAC seeks to disregard, and for which substantive claims. Plaintiff pleads that the "observance of the corporate form of WWWT, Nivisys, and Nivisys Industries would work substantial injustice on" Plaintiff and that "the corporate veil of WWWT, Nivisys, and/or Nivisys Industries should be pierced and disregarded such that their respective members and parent companies are liable for the debt owed to" Plaintiff. (Doc. 112 at 7). Plaintiff must tie this theory of derivative liability to a substantive cause of action in the SAC; it cannot seek to reach Nivisys Industries' members for the judgment domesticated in Maricopa County Superior Court. The SAC contains claims of fraudulent transfer . . . .
>
> Plaintiff's fraudulent transfer claim is asserted against WWWT and/or Nivisys and Nivisys Industries as the transferor and transferee in certain transactions, (Doc. 112 at 6), but Plaintiff seeks to hold First Texas derivatively liable for the acts of its subsidiaries. (*Id*. at 6-7, 8). Thus, Plaintiff seeks to disregard the corporate form of WWWT and Nivisys[.]

(Doc. 195 at 6). Consistent with that Order, the Court will now undertake to determine whether Airbus has presented sufficient facts to establish, as a matter of law, "that First Texas should be held derivatively liable for WWWT's and/or Nivisys's [allegedly]

- 18 -

fraudulent transfers." (*Id.*) (footnote omitted).

Generally, corporations are treated as separate legal entities unless "sufficient reason appears to disregard the corporate form." *Dietel v. Day*, 492 P.2d 455, 457 (Ariz. App. 1972). A corporate entity should be disregarded only when there is evidence to show that: (1) the parent company exerts control over the subsidiary companies such that the separateness of the subsidiaries has ceased, and (2) observing the corporate fiction would sanction injustice or fraud. *Keg Restaurants Arizona, Inc. v. Jones*, 375 P.3d 1173, 1180 (Ariz. App. 2016); *see also Loiselle v. Cosas Mgmt. Grp.*, 228 P.3d 943, 950 (Ariz. App. 2010).

To establish that the separateness of the three companies had ceased, Airbus must show that First Texas had "substantially total control" over WWWT and Nivisys. *Keg Restaurants*, 375 P.3d at 1182 (quoting *Oldenburger v. Del E. Webb Dev. Co.*, 765 P.2d 531, 536 (Ariz. App. 1988)); *Taeger v. Catholic Family & Cmty. Servs.*, 995 P.2d 721, 733 (Ariz. App. 1999). Substantially total control can be proven through factors including, *inter alia*, stock ownership by the parent, the existence of common officers or directors, a failure to maintain corporate formalities necessary for a separate corporate existence, and the parent's payment of salaries or other expenses for the subsidiary. *Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 728 (Ariz. 1991).

Here, there is no genuine dispute that First Texas wholly owns both WWWT and Nivisys. (*See* Doc. 261 at 4–5). There is also a substantial similarity between the directors and officers of all three companies. At all relevant times, Thomas Walsh was the CEO and sole director of First Texas, the President and sole manager of WWWT, and the manager of Nivisys. (Doc. 234 at 7–8). Daniel Duarte was the CFO of First Texas, the Secretary of WWWT (until August 15, 2012), and the Secretary and co-Manager of Nivisys (*Id.*). But these facts alone do not prove that First Texas had actual control over the decisions of WWWT and Nivisys. The parties have also presented conflicting evidence regarding whether corporate formalities were observed. For example, Airbus points to a laundry list of mistakes regarding who had the authority to act on behalf of

which company and when. (Doc. 232 at 9). But Airbus has presented no evidence that these mistakes were coupled with a failure to observe formalities such as meetings, voting, or minutes; and Defendants have presented evidence that the three companies maintained separate financial reporting. *See Honeywell, Inc. v Arnold Const. Co., Inc.*, 654 P.2d 301, 307 (Ariz. App. 1982) (finding no merger of corporate identity when "the formalities of corporate meeting were observed and the books were kept in some form of order"); *Seymour v. Hull & Moreland Engineering*, 606 F.2d 1105, 1112 (9th Cir. 1979) (finding a corporate shield was adequate when the parent and subsidiaries kept separate financial records). Airbus also claims that First Texas, through a third subsidiary company not included in this action, managed payroll and financial disbursements on behalf of Nivisys. (Doc. 232 at 9). But Airbus has put forth no evidence to show that this management included a co-mingling of funds or amounted to financing the activities of Nivisys. *See Honeywell*, 654 P.2d at 307.

Moreover, Airbus must also prove that observing the corporate form of First Texas, WWWT, and Nivisys would sanction fraud. *Keg Restaurants*, 375 P.3d at 1182. This Court has already determined questions of fact exist as to whether the conduct in question was undertaken with fraudulent intent, *see supra* § III(B)(3)(b), and the motions for summary judgment on the alter ego claims similarly raise material questions of fact as to whether fraud occurred. Accordingly, the Court denies the motions for summary judgment on the issue of whether First Texas may be held liable for the actions of WWWT and Nivisys under the theory of alter ego liability.

## IV.    Conclusion

The Court finds that material questions of fact exist on Airbus's claims and as to WWWT's counter-claims in this case. At trial, the following issues remain to be determined by the jury: (1) whether Nivisys is a mere continuation or merger of Industries; (2) whether the transfer of assets was for the fraudulent purpose of escaping liability for Industries' debts; (3) whether the asset transfers were constructively fraudulent because they were not made in exchange for reasonably equivalent value; (4)

whether the asset transfers were undertaken with actual intent to defraud Airbus as a creditor of Industries; and (5) whether alter ego liability should apply.

Accordingly,

**IT IS ORDERED** that WWWT Enterprises' motion for summary judgment (Doc. 221) is GRANTED as to assumption of liability, and DENIED in all other respects.

**IT IS FURTHER ORDERED** that First Texas Holdings' motion for summary judgment (Doc. 228) is DENIED.

**IT IS FURTHER ORDERED** that Nivisys, LLC's motion for summary judgment (Doc. 230) is GRANTED as to assumption of liability, and DENIED in all other respects.

**IT IS FURTHER ORDERED** that Plaintiff Airbus DS's motion for summary judgment as to alter ego (Doc. 232) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff Airbus DS's motion for summary judgment as to defendants Nivisys, LLC and WWWT Enterprises (Doc. 233) is DENIED.

**IT IS FURTHER ORDERED** that the motion to exclude expert Timothy Gay (Doc. 268) is denied (without prejudice to raising appropriate objections at trial).

**IT IS FINALLY ORDERED** that Plaintiff's motion to strike Defendants' objections (Doc. 272) is DENIED as moot.

Dated this 31st day of March, 2017.


James A. Teilborg
Senior United States District Judge